IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

TABITHA EVANS,

     Plaintiff,

v.

PENNSYLVANIA HIGHER
EDUCATION ASSISTANCE
AGENCY, d/b/a AMERCAN
EDUCATION SERVICES,

     Defendant.

CIVIL ACTION FILE

NO. 3:16-cv-82-TCB

## O R D E R

This case comes before the Court on Plaintiff Tabitha Evan's

motion [30] for summary judgment and Defendant Pennsylvania Higher

Education Assistance Agency's motion [31] for partial summary

judgment.

## I.  Background

In 2014, Evans began receiving voice messages on her cell phone

from Pennsylvania Higher Education Assistance Agency, d/b/a

American Education Services ("AES") regarding outstanding student loan payments. On October 10, 2014, Evans called AES and instructed it to stop calling her. AES called Evans thirty-five times after this phone call.

AES used Avaya Proactive Contact 4.2.1 software to call Evans. The dialing system cannot generate or dial random or sequential numbers. Instead, the system works as follows:

> [The] system uses a calling list that is created daily by an automated batch process that determines what subset of accountholders qualifies for telephonic contact that day, based on, e.g., amounts owed, delinquency status, prior contacts, consent to be called, etc. The calling list is downloaded to the dialer each morning. A human intervenes at that point to create the calling campaigns for the day. Jobs are started by the person setting up the daily workflow. The dialing system places the calls and connects them to operators when a voice is detected.

[35-2] ¶ 6.

The only factual dispute in this case involves whether prerecorded messages were made in all thirty-five phone calls. In discovery, Evans produced thirteen prerecorded messages that AES left on her cell phone. As to the other twenty-two, AES admits the calls were made, but disputes that those calls left prerecorded messages.

2

On May 18, 2016, Evans filed suit asserting a single claim under the TCPA. Following discovery, Evans filed her motion [30] for summary judgment and AES filed its partial motion [31] for summary judgment. AES seeks summary judgment as to twenty-two of the thirty-five calls, arguing that there is insufficient evidence that it used either a pre-recorded message or an automated telephone dialing system ("ATDS").

## II.  Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must

"view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 331). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific

4

facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 324).

## III. Discussion

### A. TCPA Violation

Congress passed the TCPA to restrict the use of automated telephone systems, requiring the calling party to first obtain consent from the party being called. *See* 47 U.S.C. § 227. The Federal Communications Commission ("FCC") was authorized by Congress to "prescribe regulations to implement the [TCPA's] requirements" subject to various conditions. *Id.* § 227(b)(2).

Pursuant to the TCPA, a party can bring "an action to recover for actual monetary loss from [a violation of the TCPA], or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). If a defendant's violation of the TCPA is found to be willful or knowing, a court can impose an award of up to $1,500 for each TCPA violation, irrespective of the plaintiff's actual monetary loss. 47 U.S.C. § 227(b)(3).

5

Evans must prove three elements to prevail on her claim under the TCPA: (1) that the defendant called her cellular phone, (2) using an ATDS or prerecorded message or artificial voice, (3) without her prior consent. *Augustin v. Santander Consumer USA, Inc.*, 43 F. Supp. 3d 1251, 1253 (M.D. Fla. 2012). AES admits it called Evans thirty-five times after she revoked her consent. AES disputes only whether it uses an ATDS, and argues that an issue of material fact remains as to whether it utilized prerecorded messages. Because the Court finds AES used an ATDS as a matter of law, summary judgment will be granted to Evans on all thirty-five calls.

**B.     AES's Dialing System Is an ATDS**

The TCPA defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(1)(A-B). The FCC has explained that this definition includes predictive dialing equipment that "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *In re Rules & Regulations Implementing*

6

*the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 ¶ 131 (July 3, 2003). "This is because the basic function of such equipment is 'the capacity to dial numbers without human intervention.'" *Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1220 (S.D. Fla. 2014) (quoting *id.* ¶ 132). "The principal feature of predictive dialing software is a timing function, not number storage or generation." 18 F.C.C.R. 14014 ¶ 133. In discussing equipment consisting of dialing software and a separate database of numbers, the FCC reiterated that "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls [is not] circumvented." *Id.* (quoting 47 U.S.C. § 227(a)(1)).

AES argues that its dialing system is not an ATDS because it "does not dial randomly generated or sequentially generated numbers, but instead dials numbers from a customer list," [35] at 4, and that its dialing system requires human intervention to set the parameters for the system's dialing. AES also argues that the FCC went beyond the

7

bounds of its authority and improperly expanded the definition of an ATDS.

AES argues first that its dialing system is not an ATDS because it cannot dial random or sequential numbers but instead dials from a customer list. However, there is not a meaningful distinction between dialing from a customer list and dialing "from a database of numbers" as discussed in the FCC regulations. 18 F.C.C.R. 14014 ¶ 131. Further, the FCC has clearly stated that number storage or generation is not the principal feature of a predictive dialing system, which is defined primarily with regard to its "timing function." *Id.* ¶ 133.

Contrary to AES's contention that a predictive dialer must otherwise meet the definition of an ATDS, the FCC has clearly stated that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment.'" *Id.* Thus, the fact that the dialing system does not dial random or sequential numbers does not remove it from the definition of an ATDS as defined by the FCC regulations. *See, e.g.*, *Brown v. Account Control Tech., Inc.*, No. 0:13-62765-CIV-DIMITROULEAS, 2015 WL 11181947 at *3 (S.D. Fla.

Jan. 15, 2015) (dialing system that dials numbers from a list in a file provided by defendant that connects call to an agent found to be an ATDS as a predictive dialing system).

AES next argues that the human intervention of creating calling campaigns removes its calling system from the definition of an ATDS. However, as the declaration of AES's senior manager Christopher Krobath states, "The dialing system places the calls and connects them to operators when a voice is detected." [35-2] ¶ 6. This is precisely the relevant timing function of a predictive dialer discussed in the FCC regulations. The FCC regulations considered, and ruled out, the distinction between "automatic dialing software that pulls from a preprogrammed set of telephone numbers and objectionable calls made using software that arbitrarily formulates telephone numbers [because such a distinction] would not serve the purpose of the statute." *Lardner*, 17 F. Supp. 3d at 1222 (citing 18 F.C.C.R. 14014 ¶ 133). The fact that humans create calling campaigns or program lists of telephone numbers into the dialing system does not change the fact that the dialing system makes the phone calls, without human intervention, and then connects

the phone call to an operator if and when a voice is detected. This is the essential function of a predictive dialing system as defined by the FCC.

Because the dialing system fits the definition of a predictive dialer even if a human creates the dialing system's "customer list," [35] at 5, or database of numbers for the day, the Court need not reach AES's argument regarding the FCC's interpretation of present versus theoretical capacity of a dialing system to dial random or sequential numbers. As discussed above, that is not a relevant limitation upon the definition of predictive dialers. Even if it were, AES admits that "[t]he calling list is downloaded *to* the dialer each morning." [35-2] ¶ 6 (emphasis added). If the calling list is downloaded *to* the dialer and the dialing system later "places the calls," *id.*, the dialing system has the present capacity to both "store . . . numbers to be called," and, "to dial such numbers." 47 U.S.C. § 227(a)(1)(A–B) As such, Evans is entitled to summary judgment on all thirty-five calls regardless of whether a prerecorded or artificial voice was used by AES.

10

## IV.   Conclusion

For the foregoing reasons, Evans's motion [30] for summary judgment is granted as to all thirty-five telephone calls, and AES's motion [31] for partial summary judgment is denied. Evans is ordered to submit briefing, not to exceed ten pages, regarding damages, within seven days of this Order. AES shall file a responsive brief within seven days thereafter. Evans will have seven days thereafter within which to file a reply brief on damages. The Clerk is instructed to resubmit this matter to the undersigned after all briefs have been filed.

IT IS SO ORDERED this 11th day of June, 2018.

Timothy C. Batten, Sr.
United States District Judge